IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

KARENIA M. REAPER,                    )
                                      )          4:12CV3009
                Plaintiff,            )
                                      )     MEMORANDUM AND ORDER ON
        v.                            )     REVIEW OF THE FINAL DECISION
                                      )     OF THE COMMISSIONER OF THE
MICHAEL J. ASTRUE,                    )          SOCIAL SECURITY
Commissioner of Social Security,      )          ADMINISTRATION
                                      )
                Defendant.            )
                                      )
_____     )

On January 10, 2012 , the plaintiff, Karenia M. Reaper, filed a complaint against the defendant, Michael J. Astrue, Commissioner of the Social Security Administration. (ECF No. 1.) Reaper seeks a review of the Commissioner's decision to deny her applications for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq., and for Supplemental Security Income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 et seq. See 42 U.S.C. §§ 405(g) and 1383(c)(3) (providing for judicial review of the Commissioner's final decisions under Titles II and XVI of the Act). The Commissioner has filed an answer to the complaint and a transcript of the administrative record. (See ECF Nos. 13-14.) In addition, the parties have filed briefs in support of their respective positions. (See Pl.'s Br., ECF No. 19; Def.'s Br., ECF No. 24.) I have carefully reviewed these materials, and I find that the Commissioner's decision must be affirmed.

1

# I.   BACKGROUND

On March 19, 2010, Reaper filed applications for disability insurance benefits and SSI benefits.  (Transcript of Social Security Proceedings (hereinafter "Tr.") at 113-123.)  The applications were denied on initial review, (id. at 53-54, 57-64), and on reconsideration, (id. at 55-56, 67-74).  Reaper then requested a hearing before an ALJ.  (Id. at 75-77.)  The hearing was held on June 29, 2011, (e.g., id. at 27), and, in a decision dated July 29, 2011, the ALJ concluded that Reaper "has not been under a disability, as defined in the Social Security Act, from June 1, 2003, through the date of this decision," (id. at 21 (citations omitted); see also id. at 10-21).   Reaper requested that the Appeals Council of the Social Security Administration review the ALJ's decision.  (See id. at 4.)  This request was denied, (see id. at 1-3), and therefore the ALJ's decision stands as the final decision of the Commissioner.

# II.   SUMMARY OF THE RECORD

On Disability Report forms, Reaper claimed that she became disabled on June 1, 2003, due to "Bipolar," "personality disorder," "anxiety," "bulge disc L4 & L5," and "osteoarthritis."  (Tr. at 162, 167.)  She was born in November 1970.  (Id. at 162.)  She completed the tenth grade, and she reported that she was working on a GED.  (Id. at 168, 211.)  She has some past work experience as a cleaner, maid, nurse's aide, short order cook, and waitress, but she has not worked since March 2003.  (Id. at 168-169.)

2

## A.   Medical Evidence[1]

There are no records showing that Reaper had any severe impairments prior to September 30, 2003, which was her date last insured.[2]  (See generally Tr.)

On April 23, 2004, Reaper reported to Charles R. Snyder, M.D., that she had been experiencing "3 months of non-radiating low back pain." (Id. at 401.)  She was assessed with "musculoligamentous strain injury low back" and "[p]ain syndrome right knee."  (Id.)  Dr. Snyder recommended that Reaper reduce her weight, begin physical therapy, "avoid knee, squat, bend, twist as it [sic] relates to employment

---

[1] My review of the medical evidence emphasizes the records cited by the parties in their briefs.  (See Pl.'s Br. at 4-9, ECF No. 19; Def.'s Br. at 2-8, ECF No. 24.)

[2] The ALJ noted that Reaper's "earnings record shows that [she] has acquired sufficient quarters of coverage to remain insured through September 30, 2003," which means that she "must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits."  (Tr. at 10.)  See also, e.g., Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006). Although her date last insured for the purposes of disability insurance benefits is September 30, 2003, she might be able to receive SSI benefits "if she can establish that she is disabled, regardless of her insured status."  Steed v. Astrue, 524 F.3d 872, 874 n.2 (8th Cir. 2008).  See also Herman v. Astrue, No. CIV 12-5014, 2013 WL 530468, at *1 n.1 (D.S.D. Jan. 8, 2013) ("Receipt of both forms of benefits is dependent upon whether the claimant is disabled.  The definition of disability is the same under both Titles [II and XVI].  The difference - greatly simplified - is that a claimant's entitlement to [disability insurance benefits] is dependent upon his 'coverage' status (calculated according to his earning history), and the amount of benefits [is] likewise calculated according to a formula using the claimant's earning history.  There are no such 'coverage' requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.").  Thus, to evaluate Reaper's SSI claim, all of the medical evidence in the record at the time of the ALJ's decision must be considered.  See Steed, 524 F.3d at 874 n.2.

3

activities," avoid lifting or carrying more than ten pounds, and avoid maintaining "either a seated or standing posture for more than 20 minutes continuously." (Id.) Records indicate that Reaper's condition improved and the aforementioned restrictions were gradually relaxed in June and July 2004. (Id. at 399-400.) More specifically, on July 27, 2004, it was "recommended that she not lift or carry more than 30 pounds, [not] . . . sit nor stand more than 30 minutes continuously," and "not . . . kneel or squat." (Id. at 399.) Those restrictions were to continue through October 1, 2004, at which time Reaper was to return "for clinical re-evaluation." (Id.)

On February 15, 2005, Reaper reported to Traci E. Draucker, PA-C, that she "woke up with right low back pain" on the "last couple of mornings." (Id. at 398.) Reaper was prescribed medication and encouraged to use a heating pad on her low back. (Id.) An examination performed on March 31, 2005, suggested early degenerative disc disease of the lower spine, (id. at 396), and images obtained on April 6, 2005, revealed "[m]ild degenerative disc bulge at L4-L5 resulting in bilateral neural foraminal stenosis," (id. at 395).

On April 27, 2006, Reaper presented complaints of headache, cough, and right back pain to Kristi Kohl, M.D., who diagnosed "Pansinusitis" and "Right sciatica." (Id. at 393.) Dr. Kohl prescribed medication to treat the former and administered an injection to treat the latter. (Id.) She also gave Reaper a note excusing her from work for two days. (Id.)[3]

On May 29, 2008, Reaper visited the Ogallala Medical Group and complained of pain following a fall from a horse. (Id. at 247-248.) She was instructed to apply heat to a hematoma, to "follow RICE regarding [her] ankle and wrist," and to "use

_____

[3] The record indicates that Reaper was not employed at this time. (E.g., Tr. at 42-43, 125-126, 169.)

NSAIDS as needed." (Id. at 248.)  She was also given braces for her ankle and wrist. (Id.)

On November 16, 2008, Reaper visited the emergency room at St. Francis Medical Center in Grand Island, Nebraska, and reported that she "has had persistent back pain for the last few months" after being thrown from a horse "three months ago." (Id. at 253.)  An examination revealed "some discomfort over the C7 region and midthoracic spine." (Id.)  Initial x-rays suggested that Reaper "had a type 2 dens fracture" that "looked chronic," "a posterior rib fracture . . . which also looked chronic," and "a transverse process fracture of L1 and L5." (Id. at 253-254.)  CT scans of the cervical, thoracic, and lumbar spine were then ordered, and the radiologist read them "as negative for any fracture, subluxation or dislocation." (Id. at 254.)  Reaper's physician remained "fairly certain that she at the very least has a spinous process fracture at C6 as it is quite evident on the lateral C-spine x-ray," but she found that Reaper did "not have any unstable injuries on CT or x-ray." (Id.)  Morphine was administered, and Reaper was discharged with prescriptions "for Lortab and Flexeril to use as needed." (Id.)

On December 23, 2008, Reaper participated in a "Psychiatric Diagnostic Interview" at the Mid-Plains Center in Grand Island, Nebraska. (Id. at 271.)  Reaper reported that "[s]he had a history of being treated for depression and stopped taking medication" because "[s]he could not afford it." (Id.)  She said that she experienced hopelessness, helplessness, worthlessness, and frustration, and she had problems with concentration and focus. (Id.)  She also reported "fleeting suicidal ideation with thoughts of cutting her wrists while in the shower or hanging herself," but "she did not act on these thoughts because of her children." (Id.)  She admitted to alcohol and cannabis use, and "[h]er longest period of sobriety was 2 months." (Id. at 272.)  Her

5

interviewer diagnosed "Bipolar Disorder, Type I," "Cannabis Dependence, ongoing," "Alcohol Dependence, in early remission," "Personality Disorder, NOS," "Back pain, chronic, with self reports of fractured cervical spine and lumbar spine," "Primary support group problems," Other psychosocial and environmental problems," "Housing problems," "Occupational problems," "Economic problems," "Educational problems," and "Problems with access to healthcare services." (Id. at 274-275.) He also assigned Reaper a GAF score of 45,[4] and he gave her a poor prognosis. (Id. at 275.) Reaper received a prescription for Seroquel and a coupon for 56 tablets. (Id.) She was also referred to "mandatory dual-diagnosis counseling" and directed to cease using drugs and alcohol. (Id.)

Reaper returned to the Mid-Plains Center for a follow-up on January 21, 2009. (Id. at 269.) She reported that her medication was making her feel "drunk in the morning." (Id.) However, she had "[n]o reports of problems with hopelessness,

---

[4] "The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental health-illness.'" Pate-Fires v. Astrue, 564 F.3d 935, 937 n.1 (8th Cir. 2009) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994) (hereinafter DSM-IV)). "A GAF of 31 to 40 indicates the individual has an 'impairment in reality testing or communication . . . or [a] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . .'" Id. (quoting DSM-IV at 32). "A GAF of 41 to 50 indicates the individual has '[s]erious symptoms . . . or any serious impairment in social, occupational, or school functioning . . . .'" Id. at 938 n.2 (quoting DSM-IV at 32). "A GAF of 51 to 60 indicates the individual has '[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning . . . .'" Id. at 938 n.3 (quoting DSM-IV at 32). A GAF of 61 to 70 indicates that the individual has "[s]ome mild symptoms . . . or some difficulty in social, occupational, or school functioning . . . , but [is] generally functioning pretty well . . . ." DSM-IV at 32.

helplessness, worthlessness," anger, or frustration.  (Id.)  She said that "she went to Social Services to attempt to get assistance, but . . . because she did not have a doctor in Grand Island who was willing to say she was not able to work, [she] was not provided with any assistance at this time." (Id. at 270.)  More specifically, "Social Services" recommended "that she be part of their work program," but Reaper "was reluctant because she had limitations due to pain and abnormal sensations in her spine and neck." (Id.)  Reaper was advised to participate in Social Service's work program and report any "pain or distressing sensations" to the supervisor.  (Id.)  She was "also referred to Voc. Rehab. for possible intervention." (Id.)  In addition, Reaper was advised that her "serious and persistent mental illness . . . was considered a disability," and the record notes that "she had Social Services contact [the Mid-Plains Center] for completion of disability forms." (Id.)

On June 16, 2009, Rebecca A. Schroeder, Ph.D., interviewed Reaper and prepared a psychological report.  (Id. at 277-284.)  Dr. Schroeder noted that "[o]n the way to the interview room, [Reaper] dramatically cried out in pain stating that it was for her to walk [sic].  She used the wall for support and remarked that she has significant difficulty with walking and with balance." (Id. at 277.)  Reaper reported that she was "'supposed to be on' Seroquel, but . . . she cannot afford this medication." (Id. at 279.)  She explained that she was diagnosed with bipolar disorder and a personality disorder and that she participated in counseling therapy for a few months, but she discontinued counseling and stopped taking her medication when she moved from Grand Island to North Platte.  (Id. at 280.)  She "did not report any other history of mental health treatment," though she believed she had a long history of mood swings and depression.  (Id.)  Dr. Schroeder concluded that Reaper's "intellectual functioning seemed to be within a low borderline range," adding that

Reaper's reported placement in special education classes "seemed to be consistent with this estimate." (Id. at 282.) Dr. Schroeder also concluded that Reaper's "communication skills seemed to be fair," and "she seemed able to receive, process, and express information appropriately." (Id.) Although Reaper "had a tendency to talk very rapidly and . . . continuously" and "would quickly go from one subject to another without there being any logical connections," "[s]he was easily redirected when needed." (Id.) Reaper's mood was dysphoric, but she displayed a broad range of emotion during the interview. (Id.) Dr. Schroeder noted,

> At this time, Karenia Reaper reports she is seeking benefits mainly due to her physical pain. . . .
>
> Overall she seems to have had difficulty in maintaining work both because of mental health issues and also because of learning problems. As mentioned above, the client was placed in special education and her presentation appeared to be consistent with a low borderline IQ or high mild mental retardation IQ. In regard to her mental health issues, the client has a history of only minimal services. She received services for the first time a few months ago when she sought out a therapist in Grand Island. At that time she was placed on Seroquel and also started outpatient counseling. She was involved in services for perhaps a few weeks. . . .
>
> Overall, the client's symptoms seem to be suggestive of a possible bipolar II disorder. She relates that in the past she has been diagnosed with a bipolar I disorder, however, her symptoms do not seem to be severe enough to warrant such a diagnosis. She also appears to have ongoing personality issues including borderline and dependency features.

(Id. at 282-283.) Dr. Schoeder concluded that Reaper "may have some mild restrictions in her activities of daily living related to her mental health issues." (Id. at 283.) More specifically, Reaper's "mood swings may affect her activities and

result in problems in getting things done in her day," and "[h]er personality issues seem to exacerbate these problems and at times she appears to suffer from poor motivation and low energy." (Id.) Nevertheless, Dr. Schroeder found that Reaper appeared to be able to maintain social functioning, to "sustain concentration and attention needed for at least a short and simple task," to relate appropriately to coworkers and supervisors, to adapt to changes within her environment, and to understand and remember short and simple instructions - - though her directions might need to be repeated and she might require extra supervision when undertaking a new task. (Id.) Dr. Schroeder diagnosed "Cannabis Dependence," "Bipolar II Disorder, depressed," "Personality Disorder, not otherwise specified with borderline and dependent features," "Rule out mild mental retardation versus borderline intellectual functioning," "Chronic back pain, leg pain, headaches," "Moderate stressors including marital separation, separation from children, occupational and financial problems," and "Current GAF 60, past year highest GAF 62." (Id. at 284.) She noted that Reaper's "prognosis for her mental health issues is only fair to poor" because "[s]he is not presently receiving any type of services" and "her mental health issues may depend on her substance use." (Id.)

On June 23, 2009, David Lindley, M.D., examined Reaper and prepared a medical report. (Id. at 289-293.) Reaper said that she had "persistent pain in the lumbar spine" that "shoots down both the legs," but is worse on the left. (Id. at 289.) She also reported that she "can only stand or sit in one position for 20 minutes and can walk about two blocks slowly and unaided," and that "[l]ying down in bed is very difficult." (Id. at 289-290.) She added that she "has pain in the neck" that "will shoot down both of her arms," and she has "reduced range of motion in the neck." (Id. at 290.) On examination, Dr. Lindley noted that Reaper was tender in the paralumbar

and paracervical muscles, but she had "good range of motion of the cervical and lumbar spine." (Id. at 292.) Dr. Lindley diagnosed "Chronic spinal problems . . . with lumbar spine and cervical spine," "IrReaperble [sic] bowel disease with diarrhea," "Hyperglycemia documented per history," "Bipolar disorder, poorly controlled, per claimant's admission due to noncompliance with medications due to financial issues," and "Allergies, poorly controlled at present due to season and again unable to afford medications." (Id. at 293.) He wrote, "This lady appears to have [a] multitude of problems. She certainly struggled getting around the exam room and seemed to walk with a limp . . . favoring her right leg and struggled to move around and getting [sic] on and off the exam table." (Id.)

On June 24, 2009, Reaper visited the Great Plains Regional Medical Center after suffering a "twisting injury" to her left ankle. (Id. at 473.) X-rays revealed no fracture. (Id.) There was "[n]ormal alignment," "[n]o bony lesion," normal "[s]oft tissues," and normal joint spaces. (Id.) She was given crutches and discharged in good condition with instructions to apply ice and elevate her ankle. (Id. at 474.) She was also directed to take over-the-counter Acetaminophen and Motrin. (Id.)

Reaper returned to the Great Plains Regional Medical Center on August 16, 2009, with complaints of chronic back pain that began "several months ago." (Id. at 297.) It was noted that she had not been taking her prescribed medications because she could not afford them. (Id.) She was diagnosed with "Chronic left sided lumbar radiculopathy," given injections, and discharged in stable condition with instructions to take Flexeril, Motrin, and Ultram. (Id. at 298-299.)

On March 25, 2010, Reaper visited Bridget R. Pettit, LMHP, at the North Platte Heartland Clinic and reported "struggles with depression and anxiety" and "mood instability." (Id. at 563-564.) She added that she felt more depressed over the past

two weeks, "had some suicidal thoughts," lacked energy, isolated herself, had trouble eating and sleeping, and became anxious in groups.  (Id.  See also id. at 568 (listing complaints as "[d]epression, anxiety, racing thoughts, irritability, social anxiety, flashbacks, recent suicidal thoughts and history of self harm, history of substance abuse, financial problems, limited support, medical problems, unemployment and applying for disability, and needs help getting in to see a doctor and paying for meds").  She said she wanted "to work on stabilizing her mood, improved coping, improved self esteem, and getting her life together so she can be a better parent for her children."  (Id. at 564.)  Her diagnoses included "bipolar disorder, mixed, moderate," "posttraumatic stress disorder," rule out obsessive compulsive disorder and learning disorders, "personality disorder NOS," and "borderline intellectual functioning."  (Id. at 569.)  It appears that her GAF score was 40.  (Id. at 570.)  Reaper was instructed to begin weekly outpatient mental heath therapy sessions and to see Linda Decker, APRN, and "Dr. Johnson" for medication evaluation and management.  (Id. at 568-569.)

Records indicate that Reaper kept appointments with Ms. Pettit on April 2, 9, 16, and 21, but she missed her appointment on April 30, 2010, after being arrested "in a drug sting for allegedly selling cocaine, marijuana, methamphetamine, and prescription drugs to Nebraska State Patrol undercover investigators."  (Id. at 558; see also id. at 557-561.)  Neither party emphasizes the details contained in the North Platte Heartland Clinic records, but it is fair to say that Reaper regularly attended her counseling and medication management appointments between May 5, 2010, and March 28, 2011.  (Id. at 494-556.)[5]  On April 21, 2011, her diagnoses included

---

[5] The records indicate that Reaper was in jail for a portion of this time, but she obtained permission to attend her appointments.  (E.g., Tr. at 517.)

"bipolar disorder, mixed, w/psychotic features," "generalized anxiety disorder," "posttraumatic stress disorder," and "r/o personality disorder nos," and her GAF score was 49. (Id. at 488-489; see also id. at 484-489.) Also, adjustments were made to her medications. (Id. at 482-483.) Reaper continued to attend therapy appointments between April 23, 2011, and May 11, 2011. (Id. at 478-481.)

The parties emphasize Dr. Lindley's second physical consultative examination of Reaper, which was performed on April 13, 2010, shortly after Reaper began her therapy sessions with Ms. Pettit. (Id. at 329-333.) Dr. Lindley noted that Reaper was tender in the paralumbar and paracervical muscles, that she had "reduced range of motion of spine," that she had "pain on movement of knees . . . [and] shoulders," that she was "unable to get her arms above her shoulder height or behind her back," and that she had "pain from her neck across the shoulders and down her arms." (Id. at 332.) He diagnosed "Significant back pain with cervical and lumbar disk disease and neurological radiation of pains into arms and legs," and "Significant anxiety and depression, untreated." (Id. at 333.) Dr. Lindley wrote, "This lady appears to have the above problems, which put out her work [sic] for the past seven years and getting worse." (Id.)

Sarah K. Schaffer, Ph.D., examined Reaper on May 6, 2010, and prepared a psychological report. (Id. at 334-339.) Dr. Schaffer noted that Reaper "ambulated with a considerable limp," and "[s]he reported that she walked to the appointment." (Id. at 334.) Reaper indicated that she was experiencing "severe mood variability, irritability, worthlessness, guilt, shame, helplessness, hopelessness, and suicidal ideation." (Id. at 335.) "She reported a recent suicide attempt (last week) by self-inflicted lacerations on the arms with eating utensils while she was incarcerated. She also reportedly attempted to strangle herself with her hands and could 'feel her life

12

coming to an end.'" (Id.) She denied current suicidal ideation, however, and said that she intended to honor a no-suicide contract that she made with her counselor. (Id. at 335. See also id. at 564.) Reaper reported "uncontrollable and excessive worry, racing thoughts, shakiness, and numbness" in her hands, and she "indicated a tendency to 'constantly clean' and to ensure that household items are orderly and organized." (Id. at 336.) She also "endorsed periodic auditory hallucinations characterized by a 'voice in (her) head' commenting on her worthlessness and encouraging her to 'just end it,'" but "[s]he was unable to provide further description or clarification." (Id.) Reaper reported severe pain in her legs, back, and hip that affects her "functional efficiency, productivity, . . . enjoyment," concentration, sleep, and psychological symptoms. (Id. at 337.) There is no indication that she was receiving treatment or medication for the pain, however. Dr. Schaffer's examination revealed that Reaper's memory was intact, her thought processing "was fairly logical and goal directed," and she was "cooperative and pleasant." (Id. at 337.) Dr. Schaffer noted, however, that Reaper "appeared to be in pain as she limped to the office[,] winced several times[,] and adjusted her positioning." (Id.) She was tearful, and her mood was depressed. "Overall, her self-esteem, judgment, and insight were perceived as very poor." (Id. at 338.) She reported that she is able to perform "tasks necessary to proper hygiene and gooming," "procure groceries," prepare simple meals, and "maintain clean and safe living conditions," but these activities are "endured with severe pain." (Id.) Dr. Schaffer's diagnoses included "Mood Disorder Not Otherwise Specified," "Generalized Anxiety Disorder," "Cannabis Dependence, Without Physiological Dependence, Early Full Remission Per patient report," "Pain Disorder associated with Psychological Factors (Depressive and Anxious symptoms)," "Rule Out: Borderline Intellectual Functioning," and "Personality

13

Disorder Not Otherwise Specified with Mixed Characteristics." (Id.)  Reaper's GAF score was 51.  (Id. at 339.)  Dr. Schaffer wrote, "The prognosis is poor.  Claimant's mood symptoms, anxiety, post-traumatic stress, history of substance use, possible borderline intellectual level, chronic pain, and personality features appear to cumulatively interfere with functioning across settings." (Id.)

On August 27, 2010, Reaper was admitted at the Great Plains Regional Medical Center after injuring her head, neck, left hip, and lower back in a fall "down 4 stairs." (Id. at 442.)  An examination revealed decreased range of motion in her neck, "[m]oderate vertebral tenderness of the mid cervical spine," "[t]enderness in the lumbar area," and mild tenderness in her left hip.  (Id. at 443.)  X-rays and CT scans were ordered, "but no significant abnormalities were noted."  (Id. at 444.  See also id. at 447 (indicating that x-rays revealed mild degenerative changes, very mild osteophytosis, and mild facet arthropathy in the lumbar spine); id. at 448 (indicating that CT of cervical spine revealed "soft tissue calcification posterior to the spinous processes, possibly due to prior trauma or ligamentous calcification").)  Reaper was discharged later that same day "in improved condition," and she was "able to ambulate without problems."  (Id. at 443-444.)  She was given prescription pain medications and instructed to take over-the-counter Acetaminophen.  (Id. at 444-445.)

Finally, records indicate that Reaper was hospitalized at the Great Plains Regional Medical Center on March 16-17, 2011, due to chest pain and high blood pressure.  (Id. at 425-436.)  Her blood pressure was controlled, which in turn caused her chest pain to subside during her overnight stay.  (Id. at 431.)  Her diagnoses on discharge included "Chest pain probably due to uncontrolled hypertension and anxiety related," "Uncontrolled hypertension," "Morbid obesity," and "Hypercholesterolemia."  (Id. at 431.)  She was advised to lose weight, exercise,

14

improve her diet, and follow up with her psychiatrist and a primary care physician. (Id. at 431-432.)

## B.   Reaper's Testimony

During the hearing before the ALJ on June 29, 2011, Reaper testified that she completed the ninth grade and was living in an apartment with her aunt.  (Id. at 32.) She said that she was prevented from working because pain in her lower back and neck affected her "ability to move around and be able to squat and kneel and lift." (Id. at 33.)  She also testified that she had been seeing a counselor for personality disorder, anxiety disorder, "OCD," depression, and substance abuse.  (Id. at 35.)  On a normal day, she goes to counseling and to recovery groups, and she goes to classes at the Frontier House "[t]o help [her] understand bipolar disorder and personality disorder."  (Id. at 36.)  She said that she can lift 20 or 25 pounds, walk for about a block and a half, stand for approximately 20 minutes, and sit for about 10 or 15 minutes at a time.  (Id. at 37-38.)  She listed her medications and dosages, and she explained that she obtains them through the "Assistance Patient Program" because she does not have insurance.  (Id. at 39.)  She said that her medications helped her "most of the time."  (Id.)  She had band-aids on her arm, and she explained that she "just was carving" because she was depressed and "[d]idn't want to live anymore." (Id. at 39-40.)  She explained that she felt suicidal recently because she was not able to keep her promise to see her children.  (Id. at 42.)

Reaper said that she had not worked since 2003, and her attempts to find work since 2008 have been unsuccessful.  (Id. at 42-43.)  She said her hands go numb "a lot," and she has problems walking because her feet are numb and "tingly."  (Id. at 44.)  She cannot type or use a computer.  (Id.)

15

## C.    Vocational Expert's Testimony

During the hearing, the ALJ asked a Vocational Expert (VE) to assume that an individual of Reaper's age and education who had no past relevant work was "limited to light exertional level work" and could "occasionally climb stairs and ramps but never climb ropes, ladders and scaffolds"; could "[o]ccasionally balance, stoop, kneel, crouch and crawl"; could engage in frequent, but not constant, "gross manipulation"; "should avoid concentrated exposure to extreme cold, unprotected heights, excessive vibration, [and] hazardous machinery"; and was limited to unskilled work "which requires no more than occasional contact with the public and co-workers." (Id. at 46-47.) He then asked the VE whether there were any jobs in the national or regional economy that a person with these limitations could perform. (Id. at 47.) The VE responded affirmatively, adding that such a person could perform unskilled light work as a folding machine operator, a laundry patching machine operator, or routing clerk. (Id. at 47-48.)

The ALJ then asked the VE whether a person who was limited to sedentary work (as opposed to light work), but whose limitations were otherwise identical to those described above, could perform any jobs in the national or regional economy. (Id. at 48.) The VE responded affirmatively and testified that such a person could perform sedentary, unskilled work as a pharmaceutical processor, cutter paster, and administrative support worker. (Id.)

Next, the ALJ asked whether the person described in the second question could perform work "with the added limitation that the individual should be allowed to alternate between sitting and standing up to every 60 minutes if necessary." (Id. at 48.) The VE responded that the jobs identified in response to the second question "would still remain given that hypothetical." (Id.)

16

Finally, the ALJ asked whether the person described in the third question could perform work "with the added limitation that any job must allow for occasional unscheduled disruptions of both the work day and work week, secondary to potential periods of decompensation during the work day," and with the added limitation that there would be "[u]nreliability and missing work" on an "occasional to frequent basis, secondary to symptoms or treatment, [or] possible effects of medication." (Id. at 49.) The VE responded that there would be no jobs for such a person. (Id.)

### D.   The ALJ's Decision

An ALJ is required to follow a five-step sequential analysis to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520(a); id. § 416.920(a). The ALJ must continue the analysis until the claimant is found to be "not disabled" at steps one, two, four or five, or is found to be "disabled" at step three or step five. See 20 C.F.R. § 404.1520(a); id. § 416.920(a) In this case, the ALJ proceeded to step five and found Reaper to be not disabled. (See Tr. at 10-21.)

Step one requires the ALJ to determine whether the claimant is currently engaged in substantial gainful activity. See 20 C.F.R. § 404.1520(a)(4)(i), (b); id. § 416.920(a)(4)(i), (b). If the claimant is engaged in substantial gainful activity, the ALJ will find that the claimant is not disabled. See 20 C.F.R. § 404.1520(a)(4)(i), (b); id. § 416.920(a)(4)(i), (b). In the instant case, the ALJ found that Reaper "has not engaged in substantial gainful activity since June 1, 2003, the alleged onset date." (Tr. at 12 (citations omitted).)

Step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(c); id. § 416.920(c). A "severe impairment" is an impairment or combination of impairments that significantly limits the claimant's ability to do "basic work activities" and satisfies the "duration requirement." See 20

17

C.F.R. § 404.1520(a)(4)(ii), (c); id. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months."); id. § 416.920(a)(4)(ii), (c); id. § 416.909. Basic work activities include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers and usual work situations"; and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b); id. § 416.921(b). If the claimant cannot prove such an impairment, the ALJ will find that the claimant is not disabled. See 20 C.F.R. § 404.1520(a)(4)(ii), (c); id. § 416.920(a)(4)(ii), (c). The ALJ found that Reaper "has the following severe impairments: bipolar disorder, posttraumatic stress disorder (PTSD), personality disorder, substance abuse by history, degenerative disc disease, obesity, hernia and degenerative joint disease of the left ankle." (Tr. at 12 (citations omitted).)

Step three requires the ALJ to compare the claimant's impairment or impairments to a list of impairments. See 20 C.F.R. § 404.1520(a)(4)(iii), (d); id. § 416.920(a)(4)(iii); see also 20 C.F.R. Part 404, Subpart P, App'x 1. If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be "disabled." See 20 C.F.R. § 404.1520(a)(4)(iii), (d); id. § 416.920(a)(4)(iii). If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five. See 20 C.F.R. § 404.1520(a); id. § 416.920(a). The ALJ found that Reaper "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (Tr. at 13 (citations

18

omitted).)

Step four requires the ALJ to consider the claimant's residual functional capacity (RFC)[6] to determine whether the impairment or impairments prevent the claimant from engaging in "past relevant work." See 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f); id. § 416.920(a)(4)(iv), (e), (f). If the claimant is able to perform any past relevant work, the ALJ will find that the claimant is not disabled. See 20 C.F.R. § 404.1520(a)(4)(iv), (f); id. § 416.920(a)(4)(iv), (f). The ALJ concluded that Reaper "has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), in that she can lift 20 pounds occasionally and 10 pounds frequently, sit for 6 hours out of an 8 hour day, and stand and walk for 6 hours out of an 8 hour workday. The claimant can never climb ladders, ropes or scaffolds but can occasionally climb ramps and stairs. She can occasionally balance, stoop, kneel, crouch or crawl. Handling which is gross manipulation is limited to frequent not constant. The claimant must avoid concentrated exposure to extreme cold, excessive vibration, hazardous machinery and unprotected heights. The claimant is limited to unskilled work only which requires no more than occasional contact with the general public and coworkers." (Tr. at 14.) The ALJ also found that Reaper "has no past relevant work." (Id. at 20 (citations omitted).)

Step five requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can do work other than that which he or she has done in the past. See 20 C.F.R. §

---

[6] "'Residual functional capacity' is what the claimant is able to do despite limitations caused by all of the claimant's impairments." Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)). See also 20 C.F.R. § 416.945(a).

19

404.1520(a)(4)(v), (g); id. § 416.920(a)(4)(v), (g).  If the ALJ determines that the claimant cannot do such work, the claimant will be found to be "disabled" at step five.  See 20 C.F.R. § 404.1520(a)(4)(v), (g); id. § 416.920(a)(4)(v), (g).  The ALJ wrote, "Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. at 20 (citations omitted).)  Specifically, Reaper "would be able to perform the requirements of representative occupations such as the following light unskilled jobs: folding machine operator . . . ; laundry machine operator . . . ; and routing clerk . . . ." (Id.)  Based on the foregoing, the ALJ concluded that Reaper was not under a disability between June 1, 2003, and the date of the decision.  (Id. at 21.)

### III.   STANDARD OF REVIEW

I must review the Commissioner's decision to determine "whether there is substantial evidence based on the entire record to support the ALJ's factual findings." Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997) (quoting Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996)).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion."  Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008) (citations and internal quotation marks omitted).  A decision supported by substantial evidence may not be reversed, "even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome." McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010).  Nevertheless, the court's review "is more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp' of the Commissioner's

action." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (citations, brackets, and internal quotation marks omitted). See also Moore v. Astrue, 623 F.3d 599, 602 (8th Cir. 2010) ("Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision.").

I must also determine whether the Commissioner's decision "is based on legal error." Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000). No deference is owed to the Commissioner's legal conclusions. See Brueggemann v. Barnhart, 348 F.3d 689, 692 (8th Cir. 2003).

## IV.   ANALYSIS

Reaper argues that the Commissioner's decision must be reversed because 1) the ALJ erred by rejecting Reaper's testimony without making a proper credibility determination; 2) Reaper's "ability to do activities such as light housework or visit with friends provides little or no support for the finding that a claimant can perform full time competitive work"; 3) "[t]he evidence in the record supports a finding that [Reaper] would miss substantial work," and the ALJ erred by leaving this limitation out of his RFC assessment; and 4) "[t]he ALJ failed to mention in his hypothetical to the VE all [of Reaper's] impairments." (See Pl.'s Br. at 4, 11, 16, 17, 19, 20, ECF No. 19.) I shall analyze each of her arguments in turn.

### A.   The ALJ's Analysis of Reaper's Credibility

Reaper argues first that "[t]he ALJ erred in rejecting claimant's subjective allegations of pain and limitations," failed to "make an express credibility determination detailing the reasons for discrediting the claimant's testimony," failed to "set forth the inconsistencies," and did not "set forth the Polaski factors." (Pl.'s Br.

21

at 4, ECF No. 19.)

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009) (quoting Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001)). "In assessing a claimant's credibility, the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the participating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Id. (citing, inter alia, Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "An ALJ who rejects [subjective] complaints must make an express credibility determination explaining the reasons for discrediting the complaints." Id. (citation omitted) (alteration in original). The ALJ need not explicitly discuss each of the foregoing factors, however. Id. (quoting Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005)). "It is sufficient if [the ALJ] acknowledges and considers [the] factors before discounting a claimant's subjective complaints." Id. (quoting Goff, 421 F.3d at 791) (alteration in original). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so," courts "will normally defer to the ALJ's credibility determination." Jones v. Astrue, 619 F.3d 963, 975 (8th Cir. 2010) (quoting Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010)).

The ALJ found that although Reaper "has both mental and physical severe impairments," "her allegations regarding the limitations imposed by these impairments are not fully credible." (Tr. at 17.) He then set forth several specific reasons for discounting Reaper's credibility, including the following: 1) Reaper's allegations of severe back pain are inconsistent with objective tests showing only

22

mild to moderate degeneration in her lumbar spine; 2) Reaper's allegations of severe pain are undermined by records showing that she received minimal treatment for pain, that she was merely prescribed "anti-inflammatory and muscle relaxant medications" (as opposed to "narcotic pain medications," injections, surgery, or a TENS unit), and that she was taking no pain medications at the time of the hearing; 3) the consultative examiners' findings (including GAF scores of 51 and 60) did not support Reaper's allegations regarding the severity of her depression, and the examiners noted that she was cooperative and capable of concentrating enough to complete simple tasks; 4) a GAF score of 49 in April 2011 was followed by a change in Reaper's medications and a report from Reaper "a few weeks later" that "her medications were helping control her mood"; 5) Reaper testified that her medications generally help control her mood; 6) Reaper's therapy records do not document "significant abnormalities or deficits with respect to . . . mood, affect, thought process, concentration, attention, pace, persistence, social interaction, activities of daily living, or speech"; 7) there is no evidence of "deficits in psychomotor activity, focus, contact with reality, eye contact, orientation, demeanor, abilities to cope with stress, abilities to work without decompensation, abilities to understand and follow instructions, judgment, insight, cognitive function or behavior"; 8) Reaper "recently reported being able to complete numerous programs and [was] working on completing her GED," which "shows she can concentrate to complete simple tasks"; 9) reports indicate that Reaper "was pleasant and cooperative," and there is no evidence that she had "any significant problems dealing with anyone except for her former spouse," which "indicates she has the ability to have at least occasional contact with the general public and co-workers"; 10) Reaper "reported that she had stopped going to vocational rehabilitation and really just wanted to focus on getting her disability," which

indicates that she has "very low motivation to work" and "significantly detracts from her credibility"; 11) Reaper's daily activities, including going to counseling, classes, and recovery groups and helping around the apartment "are not limited to the extent one would expect, given the complaints of disabling symptoms and limitation[s]"; and 12) Reaper's "weak work history weighs against her credibility because it shows a lack of motivation to work." (Tr. at 17-19 (citations omitted).)

A few of the ALJ's reasons for discrediting Reaper's allegations are not well-founded. Specifically, the ALJ's statement that "there is <u>no evidence in the record</u> that [Reaper] has <u>any abnormalities or deficits</u> in . . . focus, . . . abilities to cope with stress, . . . abilities to understand and follow instructions, judgment, insight, [and] cognitive function," (Tr. at 18 (emphasis added)), is belied by the transcript. Records do suggest that Reaper struggled to cope with stress, had limited ability to understand and follow instructions, demonstrated impaired judgment, and had deficits in cognitive function (i.e., mild mental retardation or borderline intellectual functioning). (<u>E.g.</u>, Tr. at 277-284; 334-339.) Overall, however, I find that the ALJ provided many good reasons for discounting Reaper's claims about the severity of her impairments, symptoms, and limitations, and his credibility assessment merits deference. Reaper's arguments that the ALJ "did not make an express credibility determination detailing the reasons for discrediting the claimant's testimony and [did not] set forth the inconsistencies and [did not] set forth the Polaski factors," (Pl.'s Br. at 4, ECF No. 19), are without merit.

Reaper also argues that certain aspects of the ALJ's decision are unsound because the ALJ formed "medical opinions" instead of making "appropriate legal determinations." (Pl.'s Br. at 11, ECF No. 19.) In particular, Reaper claims that it was improper for the ALJ to consider the fact that she received inconsistent,

conservative treatment for pain and mental illness. (Id. at 10-11.) I disagree. It is well-established that an ALJ may consider a claimant's treatment history when assessing her credibility. See, e.g., Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003) ("An ALJ may discount a claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment."); 20 C.F.R. § 404.1529(c); 20 C.F.R. § 416.929(c). More generally, I am not persuaded that the ALJ formed "medical opinions" to support his decision.

Reaper argues next that the ALJ erred by "slipp[ing] into the practice of assessing the claimant's residual functional capacity before assessing credibility." (Pl.'s Br. at 16, ECF No. 19.) Quoting at length from Bjornson v. Astrue, 671 F.3d 640 (7th Cir. 2012), Reaper seems to suggest that the ALJ's use of "boilerplate" or "template" language in his decision merits a reversal. (See Pl.'s Br. at 12-16, ECF No. 19.) It is true that the Seventh Circuit has criticized the "boilerplate" language that is used in ALJs' decisions. Bjornson, 671 F.3d at 646 ("The Social Security Administration had better take a close look at the utility and intelligibility of its 'templates.'"). See also id. at 644-46. It is also true that the ALJ's decision in this case includes language that is nearly identical to the "boilerplate" discussed in Bjornson. (Compare Tr. at 15 with Bjornson, 671 F.3d at 644.) In Bjornson, however, the Seventh Circuit did not hold that the "boilerplate" warranted reversal of the Commissioner's decision. See id. at 649 ("Whatever the cause, the administrative law judge's opinion failed to build a bridge between the medical evidence (along with Bjornson's testimony, which seems to have been fully consistent with that evidence) and the conclusion that she is able to work full time in a sedentary occupation provided that she can alternate sitting and standing."). As I noted above, in the instant case the ALJ provided several good reasons for concluding

25

that Reaper's claims about the extent of her limitations were not fully credible.  The inclusion of boilerplate language - - even if it is properly characterized as "meaningless" or "backwards"[7] - - does not render the ALJ's analysis infirm. Moreover, I am not persuaded that the ALJ determined Reaper's RFC before assessing the credibility of her subjective complaints.  (See, e.g., Tr. at 14-15 (explaining that the ALJ analyzed the credibility of Reaper's statements in order to make his RFC determination).)

Finally, Reaper suggests that it was error for the ALJ to discount her subjective complaints based on inconsistencies between those complaints and Reaper's activities of daily living.  (Pl.'s Br. at 17-18, ECF No 19.)  The ALJ wrote,

> The claimant testified that she goes to counseling and recovery groups during the day. She also testified that she goes to GED classes. The claimant also testified that she does some work around the apartment that she shares with her aunt.  Overall, the claimant's descriptions of her daily activities are essentially normal.  Her activities are not limited to the extent that one would expect, given the complaints of disabling symptoms and limitation that preclude her from work activities.  Although the claimant may not be able to engage in all of the activities that she did in the past and it may take her longer to perform the tasks, she is more active than would be expected if all of her allegations were credible.

(Tr. at 18-19.) I do not understand the ALJ's statement that "[o]verall, the claimant's descriptions of her daily activities are essentially normal."  (Id. at 18.)  That aside, it was quite appropriate for the ALJ to consider whether Reaper's daily activities are consistent with her allegations of disability.  See, e.g., Renstrom v. Astrue, 680 F.3d 1057, 1067 (8th Cir. 2012) ("We have held that acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility."

---

[7] Bjornson, 671 F.3d at 645.

(quoting <u>Halverson v. Astrue</u>, 600 F.3d 922, 932 (8th Cir. 2010))).  Also, his factual findings on this point are supported by substantial evidence in the record.

In summary, the ALJ identified several good reasons for concluding that Reaper was not fully credible, and his assessment warrants deference.

**B.    Whether the ALJ Improperly Concluded that Reaper's Daily Activities Demonstrate that She Can Perform Full Time Competitive Work**

Reaper argues that "[t]he ability to do activities such as light housework or visit with friends provides little or no support for the finding that a claimant can perform full time competitive work." (Pl.'s Br. at 4, ECF No. 19.  <u>See also</u> <u>id.</u> at 16, 17-18, 19.)  I agree with Reaper that the ability to perform certain daily activities does not establish that a claimant can perform full-time competitive work.  <u>See</u> <u>Reed v. Barnhart</u>, 399 F.3d 917, 923-924 (8th Cir. 2005).  In this case, however, the ALJ did not cite Reaper's daily activities to support his finding that Reaper was capable of certain types of full-time employment; rather, he merely noted Reaper was "more active than would be expected if all of her allegations were credible." (Tr. at 19.)  As I explained above in Part IV.A., it was proper for the ALJ to make this observation when assessing Reaper's credibility.  <u>See also, e.g.</u>, <u>Reed</u>, 399 F.3d at 923 (quoting <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1148 (8th Cir. 2001)).

**C.    Whether the ALJ Erred By Excluding Reaper's Poor Work Attendance from the RFC Assessment**

Reaper argues that "[t]he evidence in the record supports a finding that [Reaper] would miss substantial work," and she implies that the ALJ erred by excluding her "unreliability and missing work on a frequent basis" from his RFC assessment.  (Pl.'s Br. at 20, ECF No. 19.)

The ALJ presented the VE with four separate questions, and the last of them

27

included "[u]nreliability and missing work on [an] . . . occasional to frequent basis, secondary to symptoms or treatment, possible effects of medication, those types of things," as limitations.  (Tr. at 49.)  Ultimately, however, the ALJ did not include these limitations in his RFC assessment.  (See, e.g., id. at 14.)  While I agree with Reaper that the record does include substantial evidence indicating that she might be unreliable and miss work due to her symptoms or need for treatment, I find that the record also includes substantial evidence supporting the ALJ's decision to exclude those limitations from his RFC assessment.  In particular, substantial evidence supports the ALJ's conclusion that Reaper's impairments were not as severe as she alleged and that Reaper lacked motivation to work.  Under the circumstances, I cannot conclude that the ALJ erred by excluding "unreliability and missing work" from the RFC assessment.  See, e.g., Byes v. Astrue, 687 F.3d 913, 915 (8th Cir. 2012) (noting that if the Commissioner's decision is supported by substantial evidence, it will not be reversed merely because substantial evidence also supports a different conclusion).

### D.    Whether the ALJ Failed to Include All of Reaper's Impairments in the Hypothetical Question Posed to the VE

Reaper argues, without elaboration, that "[t]he ALJ failed to mention in his hypothetical to the VE all [of Reaper's] impairments."  (See Pl.'s Br. at 20, ECF No. 19.)

> A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true.  The hypothetical question must capture the concrete consequences of the claimant's deficiencies.  However, the ALJ may exclude any alleged impairments that he has properly rejected as untrue or unsubstantiated.

Perkins v. Astrue, 648 F.3d 892, 901-02 (8th Cir. 2012) (citations, quotation marks,

and alteration brackets omitted).  I find that the ALJ's first hypothetical question to the VE was sufficient, and any alleged impairments or limitations that were excluded from the question (e.g., the "unreliability" discussed in Part IV.C. above) were properly rejected.

**IT IS ORDERED** that the Commissioner of Social Security's decision is affirmed.

Dated March 6, 2013.

BY THE COURT

_Warren K. Urbom_

Warren K. Urbom
United States Senior District Judge

29